**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PRO GOLF OF FLORIDA, INC., and
M. FRANK FAZILAT,

              Plaintiffs,

v.
                                    Case No. 05-71380
                                    HON. MARIANNE O. BATTANI

PRO GOLF OF AMERICA, INC.,

              Defendant.
_____/

**OPINION AND ORDER DENYING**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Before the Court is plaintiffs Pro Golf of Florida, Inc., and M. Frank Fazilat's Motion for

Partial Summary Judgment (Doc. #21). Plaintiffs sued Defendant for breach of contract arising

out of Defendant's alleged sales of golf merchandise in Plaintiffs' designated franchise

territories. Plaintiffs ask the Court to determine that Defendant's internet sales of golf

merchandise constituted a breach of their franchise agreements, and that Plaintiffs were legally

justified to terminate those agreements because of Defendant's breach.

Pro Golf of America ("PGA") is a Farmington Hills, Michigan based golf store franchiser

that has been in business for forty-two years. PGA has approximately 120 franchises located

throughout the United States, Canada, Puerto Rico, the Philippines, and Ireland. Pro Golf of

Florida, Inc., and M. Frank Fazilat joined the PGA chain and entered into franchise agreements

("Agreements") with Pro Golf on April 1, 1996, and December 4, 1997, respectively.

In late 1999, PGA announced at a meeting of franchisees that it intended to sell its products over the internet.  In order to realize this goal, PGA planned to form a new corporation for its internet sales, and would allow the franchisees to invest in the corporation.  However, PGA received objections from certain franchisees, and also experienced difficulty financing the venture.

In November 2001, PGA once again attempted to start up its internet business and solicited cooperation from its franchisees through its "ProGolf.com Internet Participation Agreement."  The agreement was intended to allay any previous objections, and proposed that franchisees would receive the commissions from all sales to customers in their defined territories, in exchange for certain obligations to be imposed on the franchisees.  The Internet Participation Agreement also asked franchisees to waive any territorial rights that the franchise agreements may have afforded them in the area of internet sales.  Plaintiffs declined to sign on to the Internet Participation Agreement and PGA initially agreed to block internet sales to customers located in Plaintiffs' territories.  However, sometime in 2004, Defendant determined that the internet sales of their golf merchandise did not violate the Agreements, and deemed it necessary to expand its internet sales into all territories in order to keep up with its competition.

In July 2004, the president of PGA, Brian Donnelly, visited Plaintiffs' one Tennessee and three Florida stores to meet with the store managers.  Donnelly informed them that PGA would open their territories to internet sales.  None of the managers expressed concern with that decision, or said it would be a breach of the Agreements.  However, six months later in December, Plaintiffs sent a notice of default to Defendant, expressing their dissatisfaction with Defendant's decision to open their territories to internet sales, and stating their belief that

2

Defendant breached the Agreements by selling to customers in their designated franchise territories via the Web.

Because the Agreements provide for a thirty-day period for PGA to cure any alleged breach, Donnelly attempted to assuage Plaintiffs' concerns through phone conversations and personal visits to their Florida and Tennessee locations.  After several meetings, he thought all their concerns had been addressed.

However, on February 11, 2005, PGA received a letter from Fazilat that sought termination of the Agreements.  PGA denied the accompanying allegations in the letter, and sent correspondence to Plaintiffs reminding them of Donnelly's efforts to address their concerns.  PGA also attempted to cure the alleged breach by sending Plaintiffs the summaries of its internet sales along with the commission checks for those sales.  Because the parties could not resolve the problem in accordance with the Agreements, on February 19, 2005, PGA filed a demand for arbitration.  On April 8, 2005, Plaintiffs initiated the instant suit, and the Court subsequently granted a motion to stay the arbitration proceedings.

Plaintiffs argue that PGA breached their Agreements by engaging in internet sales of its golf merchandise through its sister entity, ProGolf.com., Inc. ("ProGolf.com").  Plaintiffs seek partial summary judgment on the issues of whether Defendant breached the Agreements by selling its golf merchandise via the Web, and whether Plaintiffs were entitled to terminate the Agreements because of Defendant's breach.  Defendant contends that summary judgment is inappropriate because there is a dispute over whether the sales took place within Plaintiffs' territories, that Plaintiffs are attempting, in bad faith, to dissolve the Agreements in order to

avoid paying royalties, that any breach was not material, and that it attempted to cure the breach by tendering the full commissions on the sales.

## III.     STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to  support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the

4

nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  See Hunt v.

Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would

have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or

defense asserted by the parties, and would necessarily affect [the] application of appropriate

principle[s] of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d

171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed.

1979)).  To create a genuine issue of material fact, the nonmovant must do more than present

some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the
> nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's]
> evidence is merely colorable, or is not significantly probative, summary judgment
> may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the 'record taken

as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan

Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The evidence itself need not

be the sort admissible at trial.  Tinsley v. General Motors Corp., 227 F.3d 700, 703 (6th Cir.

2000).  However, the evidence must be more than the nonmovant's own pleadings and affidavits.

Smith v. Campbell, 250 F.3d 1032, 1036 (6th Cir. 2001).  The mere existence of a scintilla of

evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon

which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

IV.     ANALYSIS

The April 1, 1996, and December 4, 1997, franchise agreements with Pro Golf for the

5

operation of the franchises in Tennessee and Florida are the same except for Paragraph 2, which

describes the territories of the Distributor.  The relevant provisions of both Agreements

regarding the exclusive rights of plaintiffs to distribute products utilizing their trademarks and

trade names in their assigned territories are as follows:

> **WHEREAS,** DISTRIBUTOR, aware of the foregoing, desires to secure an exclusive distributorship in its Territory (as hereinafter defined) to utilize the trade names and trademarks of PRO GOLF and to utilize the expertise of PRO GOLF and PRO GOLF is willing to grant such distributorship to the DISTRIBUTOR upon the terms and conditions hereinafter set forth.

> **NOW, THEREFORE,** in consideration of the mutual covenants and payments set forth herein, the parties hereto agree as follows:
> 1.    **APPOINTMENT OF DISTRIBUTOR.**    PRO GOLF hereby grants to DISTRIBUTOR and DISTRIBUTOR hereby accepts from PRO GOLF a non-exclusive, non-transferable right to utilize the trademarks and trade names "PRO GOLF OF AMERICA", "PRO GOLF DISCOUNT" or PRO GOLF DISTRIBUTORS" and to receive the services set forth in Paragraph 3 hereof.  During the term of this Agreement, PRO GOLF agrees (subject to the terms of Paragraph 12 hereof) that it shall not establish or grant to any other person or entity a distributorship within the Territory defined in Paragraph 2 hereof without the written consent of DISTRIBUTOR.  In no event, however, shall PRO GOLF be liable for sales to persons or entities within the Territory made by any other distributor of PRO GOLF, except such as are made directly by PRO GOLF or its employees or agents.

> 2.    **TERRITORY.**        The territory covered by this Agreement shall consist of and be limited to the geographical area comprising the City of Brentwood and a fifteen (15) mile radius surrounding the initial store opened by DISTRIBUTOR (the "Territory").  The City of Brentwood is located in the State of Tennessee.  The location of the store to be operated by DISTRIBUTOR shall be on the corner of Bakers Bridge Road and Mallory Road.  A PRO GOLF distributor is currently operating at 1661 Gallatin Pike North, Madison, Tennessee 37115 ("Existing

6

Store").  DISTRIBUTOR shall not locate a store within the area contained within a twelve (12) mile radius of the Existing Store. PRO GOLF has no obligation to develop, promote or sustain other PRO GOLF distributors in any geographical territory or market including any geographical area surrounding or in proximity to the Territory.  The DISTRIBUTOR understands and expressly acknowledges and agrees that PRO GOLF has the unrestricted right to engage directly and indirectly, through its distributors or otherwise in the sale of golf equipment or related products in any geographical area outside the Territory utilizing the trademarks licensed herein or other marks unless specifically restricted by some other written provision of this Agreement.  PRO GOLF shall have the right to license other PRO GOLF distributors within the Territory, upon the terms and conditions set forth in Paragraph 12 of this Agreement.

April 1, 1996, Franchise Agreement.

      2.    **<u>TERRITORY.</u>**    The territory covered by this Agreement shall consist of and be limited to the geographical area comprising the Florida Counties of Sarasota and Manatee (the "Territory").  The location of the two (2) stores to be operated by Distributor shall be 3836 Tuttle Ave., Sarasota, Florida 34239 and 7690 South Tamiami Tr., Sarasota, Florida 34231.  PRO GOLF has no obligation to develop, promote or sustain other PRO GOLF distributors in any geographical territory or market including any geographical area surrounding or in proximity to the Territory. The DISTRIBUTOR understands and expressly acknowledges and agrees that PRO GOLF has the unrestricted right to engage directly and indirectly, through its distributors or otherwise in the sale of golf equipment or related products in any geographical area outside the Territory utilizing the trademarks licensed herein or other marks unless specifically restricted by some other written provision of this Agreement.  PRO GOLF shall have the right to license other PRO GOLF distributors within the Territory, upon the terms and conditions set forth in Paragraph 12 of this Agreement.  This Agreement authorizes DISTRIBUTOR to operate two (2) stores within the Sarasota County portion of the Territory which both must be open and commence operations by the date specified in Paragraph 12 of this Agreement.  Expansion within the Territory beyond these two (2) stores is governed by Paragraphs 11 and 12 hereof.

. . . .

7

     8.    **TERM.**    This Agreement shall remain in full
force and effect for a period of thirty (30) years from the date
hereof unless earlier terminated as set forth herein.

December 4, 1997, Franchise Agreement.

The Agreements contained a choice-of-law provision that provides for application of Michigan law in the construction and enforcement of the Agreements. "If the contract language is clear and unambiguous, its meaning is a question of law. Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist., 550 N.W.2d 228, 237 (1996). If a contract provision is clear and unambiguous, "the terms are to be taken and understood in their plain, ordinary, and popular sense." Clevenger v. Allstate Ins. Co., 505 N.W.2d 553, 557 (Mich. 1993). A contract which admits of but one interpretation is unambiguous. Fragner v. Am. Cmty. Mut. Ins. Co., 502 N.W.2d 350, 352 (Mich. Ct. App. 1993). "A contract is ambiguous if 'its words may reasonably be understood in different ways.'" UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 414 (1998) (quoting Raska v. Farm Bureau Ins. Co., 314 N.W.2d 440, 441 (Mich. 1982). If a contract is ambiguous, its meaning becomes a question of fact with the fact-finder trying to discern the parties' intent. Id. If any ambiguity exists in the contract, the Court may refer to extrinsic evidence to determine the intent of the parties, but any ambiguity in the language of the contract must be construed against its drafter. United Rentals (N.A.), Inc. v. Keizer, 355 F.3d 399, 409 (6th Cir. 2004). In interpreting a contract, the court should read the contract as a whole and arrive at a construction that will give fair meaning to all of the language employed by the parties. City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581, 585 (6th Cir. 2001). "Summary judgment may be appropriate even if ambiguity lurks as

8

long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations."  GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 818 (6th Cir. 1999); See also United Rentals,  at 409.

Plaintiffs contend that Defendant breached the franchise agreement in two different ways: 1) by selling merchandise with the Pro Golf trademark within the defined territories in contravention of the express language in the Agreements; and, 2) by encroaching on Plaintiffs' exclusive right to sell PGA merchandise in their designated territories.

While the language in the Agreements is silent as to the specific issue of internet sales, there is nothing ambiguous about the language in the Agreements.  Defendant breached the Agreements if it, or its employees or agents, made sales to persons or entities within Plaintiffs' defined territories, or if it granted a distributorship  in the designated territories to any other person or entity.  "In no event, however, shall PRO GOLF be liable for sales to persons or entities within the Territory made by any other distributor of PRO GOLF, except such as are made directly by PRO GOLF or its employees or agents."  Pl.'s Ex. A, April 1, 1996, Franchise Agreement.  In order to determine if the internet sales breached the Agreements, it must be determined where the sales took place.

Michigan's version of the Uniform Commercial ("UCC") defines when a sale takes place: "A 'sale' consists in the passing of title from the seller to the buyer for a price."  MICH. COMP. LAWS ANN. § 440.2106(1).  Likewise, Michigan's version of the UCC delineates when title passes:

> Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in

9

2 05-cv-71380-MOB-DAS   Doc # 45   Filed 03/01/06   Pg 10 of 13   Pg ID 1132

> particular and despite any reservation of a security interest by the bill of lading
> (a) if the contract requires or authorizes the seller to send the goods to the buyer
> but does not require him to deliver them at destination, title passes to the buyer at
> the time and place of shipment; but
> (b) if the contract requires delivery at destination, title passes on tender there.

Id., at § 440.2401(2).  In other words, "title passes when the vendor has fully performed its

contract in the preparation and delivery of the goods to the vendee, and delivery to a public

carrier for transportation constitutes delivery to the vendee."  4 MICH. CIV. JUR. *Carriers* § 58.

As is evident by the language in  MICH. COMP. LAWS ANN.§ 440.2401(2), the rules regarding

sales set forth in the UCC only come into play when the parties have not contractually agreed to

different terms.  However, the UCC rules are the default rules absent agreement to the contrary,

and are instructive on the issue of where the sales may have taken place.  Defendant contends

that the alleged sales on ProGolf.com took place in either Pennsylvania, where Global Sports

Interactive, Inc. ("GSI"), the company who operates and maintains the website has its offices, or

in Louisville, Kentucky, where GSI has its warehouse and where all sold goods are shipped

from.[1]  Because neither party has submitted copies of the sales invoices or the shipping

documents that would identify any contractual terms, or lack thereof, regarding the passing of

title or shipping terms, there remains a question of fact whether the sales were made within

Plaintiffs' defined territories.

Next, Plaintiffs argue that Defendant violated their rights to be the exclusive distributor

of Defendants' products within the designated territories.  Plaintiffs advance two prongs to this

argument: 1) that extrinsic evidence demonstrates that the Agreements precluded PGA from

---

[1]  Likewise, Kentucky and Pennsylvania have both passed identical versions of this
section of the Uniform Commercial Code.  13 PA. CONS. STAT. § 2401(2), KY. REV. STAT. ANN.
§ 355.2-401.

10

engaging in internet sales in the franchise territories without Plaintiffs' consent; and, 2) there is

no limitation in either the Agreements or in the ordinary definition of the terms which would

limit the means and methods by which Plaintiffs have the exclusive right to distribute

Defendant's products within the defined territories, thus, any sale to a customer within its

territory is protected by the franchise agreement.

      First, the Court need not look to extrinsic evidence when the language of the Agreements

is unambiguous.  While the language in the Agreements does not specifically mention the issue

of internet sales, it is not completely silent as to a reservation of the right to engage in such sales.

Two clauses in the Agreements address Plaintiffs' arguments.  First, "PRO GOLF agrees . . . that

it shall not establish or grant to any other person or entity a distributorship within the Territory

defined in Paragraph 2 hereof without the written consent of DISTRIBUTOR . . . ."   December

4, 1997, and April 1, 1996, Franchise Agreements, at para 1. Second,

> The DISTRIBUTOR understands and expressly acknowledges and agrees that
> **PRO GOLF has the unrestricted right to engage directly and indirectly,
> through its distributors or otherwise in the sale of golf equipment or related
> products in any geographical area outside the Territory** utilizing the
> trademarks licensed herein or other marks unless specifically restricted by some
> other written provision of this Agreement.

December 4, 1997, and April 1, 1996, Franchise Agreements, at para. 2.  Plaintiffs signed the

Agreements with the understanding and express acknowledgment that Defendant has the

unrestricted right to engage in direct and indirect sales of its equipment through its distributors

*or otherwise* as long as the sale occurred outside of Plaintiffs' defined territories.  Id.  Thus,

despite Plaintiffs contentions, the Agreements do reserve Defendant's right to engage in

merchandise sales over the internet and through mail order means, as long as those sales do not

occur in Plaintiffs' defined territories.  Further, while the Agreements may not have limited the

11

means and methods by which Plaintiffs have the exclusive right to distribute Defendant's products within their defined territories, neither do they limit the way Defendant may market, or sell its products outside of Plaintiffs' territories.  Rather, the Agreements merely limit Defendant from selling its products within Plaintiffs' defined territories.  As discussed above, it is entirely possible, if not likely, that the sales did not occur in Plaintiffs' territories.  Moreover, Plaintiffs received a non-exclusive right to utilize the trademarks and trade names associated or owned by PGA, and not the exclusive right to sell PGA's merchandise to customers that reside within its defined territories, regardless of how or where, the merchandise is purchased.  Therefore, because there is a question of fact whether such sales were made in Plaintiffs' defined territories, there is also a question of fact whether Defendant has violated their rights to be the exclusive distributor of Defendants' products within their territories.

Finally, because a material question of fact exists whether PGA made sales within Plaintiffs' franchise territories, the Court cannot say, as a matter of law, that Plaintiffs had the right to terminate the Agreements.  As Plaintiffs point out in their Reply Brief, proceeding on one's own in interpreting contractual rights without court guidance is an action fraught with peril, and the impetuous party must suffer the consequences if its interpretations turns out to be incorrect.  See Walker & Co. v. Harrison, 81 N.W.2d 352, 355 (Mich. 1957).


**V.     CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

12

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

### CERTIFICATE OF SERVICE

Copies of this Order were served upon  Mark A. Aiello and Jeffery D. Meek on this date

by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
Case Manager

13